UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HOGSTON,

               Plaintiff,                 CIVIL ACTION NO. 12-12626

v.                                MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**<u>OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING THE COMMISSIONER'S
MOTION FOR SUMMARY JUDGMENT (DKT. NOS. 14, 21)</u>**

## I.      PROCEDURAL HISTORY

Plaintiff John Hogston challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 14, 21). Plaintiff also responded to the Commissioner's motion (Dkt. No. 23). The parties have consented to this Magistrate Judge's jurisdiction to decide the motions and enter final judgment (Dkt. Nos. 13, 24). Because the Administrative Law Judge ("ALJ") improperly analyzed the opinion of Plaintiff's psychologist, Plaintiff's motion for summary judgment is **GRANTED**, Defendant's motion for summary judgment is **DENIED**, and the case is **REMANDED** to the Commissioner.

## II.     GOVERNING LAW

### A. *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. §416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses" (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party" (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III. ANALYSIS

#### A. *Administrative Proceedings*

Plaintiff applied for disability insurance benefits on August 21, 2009, alleging he became disabled on January 1, 2008 (Tr. 30). After the Commissioner initially denied Plaintiff's application, he appeared with counsel for a hearing before ALJ James M. Fuller, who considered the case *de novo* (Tr. 30). In a written decision, the ALJ found Plaintiff was not disabled (Tr. 30-40). Plaintiff requested an Appeals Council review (Tr. 13-26). On May 2, 2012, the ALJ's finding became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-6).

### B. ALJ Findings

Plaintiff was 43 years old on his disability onset date in January of 2008 (Tr. 38). He has a tenth grade education and past relevant work as a construction worker (Tr. 38). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his disability onset date (Tr. 32).

At step two, the ALJ found that Plaintiff's degenerative disc disease was a "severe" impairment (Tr. 32).[1] The ALJ found that Plaintiff's incontinence and depression were non-severe impairments (Tr. 32-34).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 34).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform the full range of sedentary work (Tr. 34).[2]

At step four, the ALJ found that Plaintiff could not perform his past relevant work as a construction worker (Tr. 38).

At step five, the ALJ found Plaintiff was not disabled, because he could perform a significant number of jobs available in the national economy (Tr. 39-40).

---

[1] "Degenerative disc disease is a spinal condition caused by the breakdown of [the] intervertebral discs." *See* http://www.mayfieldclinic.com/PE-DDD.htm (last visited August 20, 2013).

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

### C.  Administrative Record

### 1.        Plaintiff's Hearing Testimony and Statements

Plaintiff has experience doing home improvement: primarily painting and carpentry work (Tr. 47-48, 56-57). From 2002 through 2009, Plaintiff did as much home improvement work as he could, which he said was "very little" (Tr. 48, 55, 57). The jobs did not require Plaintiff to lift more than 10 pounds, involved climbing ladders, and usually lasted only two days a week (Tr. 55-57).

Plaintiff testified that he can no longer work because he has back problems when he stands or sits for long periods of time, and the medication he takes for his back pain causes drowsiness. He usually has to lie down when he takes Valium (Tr. 49). Plaintiff described his back pain as a 10 out of 10 at its worst, which occurs once or twice a month and lasts for one to two weeks; otherwise, his pain is a 5 out of 10 (Tr. 54). Plaintiff testified his back problems stem from a 1997 auto accident (Tr. 58). Back surgery has been suggested, but Plaintiff wants to leave that as a last resort (Tr. 57).

Plaintiff described his enuresis (urinary incontinence): he must be constantly aware of a bathroom's location, because if he does not get to one within two minutes, he will have an accident (Tr. 51-52); he estimates that he would need to use the bathroom at least 10 times during the course of an eight-hour workday (Tr. 52).

Plaintiff also described numbness in his hands and legs that causes him to "drop things a lot" (Tr. 49). He has no difficulty buttoning his shirt, but he sometimes has difficulty opening jars (Tr. 54).

Plaintiff has a history of depression (Tr. 49). He explained that he has felt hopeless for most of his life. This feeling has intensified in recent years – he reported feeling this way most

hours of the day (Tr. 52).  Plaintiff said that his depression is worsening because of his unemployment status, incontinence, and back problems (Tr. 53).

Plaintiff testified that the constant pain in his back and legs and his incontinence are always on his mind, making it hard for him to focus and concentrate (Tr. 53). Plaintiff said that he could not perform a full-time job that required him to lift more than six pounds – even if it offered an option to sit whenever he needed to – because "of the pressure [he] would feel that [he] was under[;] . . . the distraction from the depression[; and] . . . the fear of not being able to use the bathroom when [he] need[ed] to" (Tr. 59).

Plaintiff said that he can drive, stand and sit for 20 to 30 minutes, lift up to 10 pounds, and walk approximately two blocks without stopping (Tr. 49-50, 57); he must occasionally lie down because of his medications (Tr. 49-50). Plaintiff was taking Vicodin and Valium two to four times a week; he took more Vicodin when he experienced "an episode" (Tr. 50).

## 2.        Vocational Expert ("VE") Testimony

The ALJ asked a VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience. The VE testified that such an individual would be precluded from unskilled entry level work if he had to go to the bathroom ten times a day (Tr. 63). The individual would be precluded from all work if: he had severe depression, but not if his depression was moderate (i.e., that he could remain on task through the majority of the day); or, he had to lie down periodically throughout the day (Tr. 63).

During examination by Plaintiff's attorney, the VE testified that the individual would be precluded from work if he: were limited to less than two hours of sitting, standing, and walking; were absent more than one day a month; or, could not remain on task at least 90 percent of the time (Tr. 64). The individual would also be precluded from work if he had marked difficulties in:

-7-

maintaining social functioning, including responding appropriately to supervision and authority; completing tasks in a timely manner and assuming increased mental demands associated with competitive employment; sustaining an ordinary routine without special supervision; completing a normal workday and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with coworkers and peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; or, setting realistic goals or making plans independently of others (Tr. 64-65).

### 3.   Relevant Medical Evidence

#### a. *Physical Limitations*

On February 7, 2008, Plaintiff began treating with Thomas M. Pinson D.O.; he complained of lower back pain and urination problems (Tr. 236-38). Plaintiff returned in April and May of 2008 with the same complaints (Tr. 232-35).

On September 15, 2008, a renal ultrasound revealed Plaintiff's kidneys were functioning normally (Tr. 330). An ultrasound of Plaintiff's prostate was also taken; it revealed no evidence of enlargement or a mass (Tr. 330).

On November 11, 2008, Plaintiff saw urologist John R. Lanesky, D.O. for urinary incontinence, complaining that it had gradually worsened since its original onset in 2001; Plaintiff was experiencing incontinence nearly every night (Tr. 194, 322). Dr. Lanesky reported that Plaintiff experienced urgency and intermittent dysuria[3] every one to two hours; Plaintiff had

---

[3] Dysuria is painful urination or difficulty with urination. *See Dorland's Illustrated Medical Dictionary*, 592 (31st Ed. 2007).

an International Prostate Symptom Score (I-PSS) of 14 (Tr. 194, 322).[4] Plaintiff's physical examination revealed that his prostate was free of nodules; microscopic urinalysis was negative; and, his post void residual volume per bladder scan was low (Tr. 194, 322). Dr. Lanesky diagnosed Plaintiff with incontinence and questionable interstitial cystitis (Tr. 194, 322).[5] He requested a urodynamic study for positive lower urinary tract evaluation (Tr. 194, 322).

On March 4 and February 7, 2009, Plaintiff saw Dr. Pinson with complaints of back pain, insomnia, and urination problems (Tr. 230-31, 236-37). He was prescribed Vicodin, Valium, and Remeron, an antidepressant (Tr. 231, 236-37). On May 17, 2009, Dr. Pinson ordered an MRI of Plaintiff's lumbar spine; it revealed no loss of lumbar vertebral body height or malalignment, but did show multilevel degenerative disc disease at various points (Tr. 221-22).

In June, July, August, and September of 2009, Plaintiff visited Dr. Pinson with complaints of back pain and incontinence (Tr. 224-28). He was prescribed Vicodin, Valium, and Remeron; treatment notes also indicate that Plaintiff reported wearing adult diapers (Tr. 224-25, 227).

On December 3, 2009, Asit K. Ray, M.D. conducted a consultative examination of Plaintiff; Plaintiff reported that he had no problem with his spine, but had back pain (Tr. 240). Dr. Ray noted Plaintiff's previous MRI, which revealed a bulging disc (Tr. 240). Plaintiff reported that he could independently dress, undress, and perform bathroom activities; drive; and,

---

[4] I-PSS is a questionnaire used to assess the severity of a patient's urinary symptoms, and determine whether a patient has an enlarged prostate. A score of 14 out of 35 falls within the 8-19 range, which indicates moderate symptoms. *See* http://www.urospec.com/uro/Forms/ipss.pdf (last accessed August 20, 2013).

[5] "Interstitial cystitis is a chronic condition characterized by a combination of uncomfortable bladder pressure, bladder pain and sometimes pain in [the] pelvis, which can range from mild burning or discomfort to severe pain." *See* http://www.mayoclinic.com/health/interstitial-cystitis/DS00497 (last accessed August 20, 2013).

was working part time doing home improvement (Tr. 240). Dr. Ray noted Plaintiff's chief

complaints: pain in his back and legs after standing "for [a] long period of time," and shaking in

his legs when he gets up from sitting (Tr. 241). There was no numbness in Plaintiff's legs (Tr.

241). Dr. Ray's physical examination revealed that Plaintiff walked without a limp or need of an

assistive device (Tr. 241-42). Plaintiff could also walk on his tiptoes and heels, squat fully with

deep knee and hip bending, stand up independently, and make a fist with both hands (Tr. 241-

42). Plaintiff showed no evidence of lumbar paravertebral muscle spasm or soft tissue

tenderness, voiced mild tenderness upon palpation, and performed a straight-leg test[6] on both

sides without radicular pain (Tr. 241-42). Plaintiff could also open a jar with both hands, showed

no difficulty getting on and off the examination table, could sit and stand independently, and he

was independent in his self-care and activities of daily living (including driving) (Tr. 242). Dr.

Ray noted that an MRI showed a disc bulge and degenerative changes, but found no evidence of

neurologic deficits (Tr. 242). Dr. Ray concluded that Plaintiff "should be able to perform his

usual and customary activities including his occupational duties with out [sic] any restrictions"

(Tr. 242). He also noted that Plaintiff was taking Vicodin, Valium, Flomax, and Remeron (Tr.

244).

On January 5, 2010, Saadat Abbasi, M.D., a state consultant, completed a Physical RFC

(Tr. 249-56); he referred to treatment notes from February of 2008 through July of 2009, and the

findings of Dr. Ray's consultative evaluation (Tr. 251, 255-56). Dr. Abbasi found that Plaintiff

could: occasionally lift 50 pounds and frequently lift 25 pounds; stand, sit, or walk

---

[6] A straight-leg raise test helps determine if an individual has nerve root irritation.  A
negative test means the individual did not experience pain when the leg was elevated between 30
and 60 degrees, and it helps rule out nerve root irritation as the cause of pain.  *See*
http://meded.ucsd.edu/clinicalmed/joints6.htm (last visited August 19, 2013).

-10-

approximately six hours in an eight-hour workday; occasionally climb ladders, rope, and

scaffolds; and, frequently climb, balance, stoop, kneel, crouch, and crawl (Tr. 250-53). Plaintiff

reported that he had pain that interfered with sleep, but he could prepare meals, do chores, mow

the lawn, drive, go out alone, shop for food, handle finances, read, listen to music, visit family,

go to church, and he did not use ambulatory aids (Tr. 254). Plaintiff indicated he had difficulty

lifting, walking, bending, standing, and completing tasks; he stated that he could only lift 10

pounds and walk one to two blocks (Tr. 254). Dr. Abbasi concluded that "[Plaintiff's] statements

regarding the severity with which his [medically determinable impairments] limit or restrict

functional capacity are considered partially credible" (Tr. 254).

Plaintiff continued to treat with Dr. Pinson through May of 2010 for back pain and

incontinence, and continued to take Valium, Vicodin, and Remeron (Tr. 265-272). On March 29,

2010, Dr. Pinson ordered electrodiagnostic studies for Plaintiff, which showed evidence of a left

L4-5 radiculopathy (Tr. 274).[7]

On August 25, 2010, Dr. Pinson completed an RFC questionnaire for Plaintiff's bladder

problem (Tr. 286-90). He found that Plaintiff needed to urinate 10 to 12 times a day; was

incontinent three to four times a day; and, Flomax improved Plaintiff's symptoms (Tr. 286-87).

Dr. Pinson indicated that Plaintiff could: occasionally lift less than 10 pounds; never climb

ladders; rarely twist, stoop, crouch, and climb stairs; walk less than one block without rest or

severe pain; sit and stand for 10 minutes, thus requiring an option to sit and stand at will; and sit

and stand for a total of two hours of an eight-hour workday (Tr. 288-90). Plaintiff also needed a

job that allowed ready access to a restroom and unscheduled restroom breaks – every 20 to 90

---

[7] Radiculopathy is disease of the nerve roots. *See Dorland's Illustrated Medical
Dictionary*, 1595 (31st Ed. 2007).

minutes, for five minutes at a time without advance notice – during an eight-hour workday (Tr. 288-90). Further, Plaintiff would need to change his clothes daily following urinary incontinence, and would be absent from work more than four days a month (Tr. 288-90).

That same day, Dr. Pinson completed an RFC questionnaire for Plaintiff's lumbar spine (Tr. 291-94). Dr. Pinson referred to the May 17, 2009 MRI that revealed multilevel degenerative disease and Plaintiff's L4-L5 radiculopathy; he described Plaintiff's symptoms as lower back pain that was between a six and an eight on a scale of 1–10, and radiated to his lower extremities (Tr. 291). Dr. Pinson reported that Plaintiff had reduced range of motion, tenderness, a positive straight-leg test, muscle spasms, atrophy, weakness, and impaired sleep (Tr. 292). He opined that Plaintiff could: walk less than one block without rest or severe pain; sit and stand for ten minutes; sit and stand for less than two hours in an eight-hour workday, including five minutes of walking every fifteen minutes; occasionally lift less than 10 pounds; never climb ladders; and, rarely twist, stoop, crouch/squat, or climb stairs. Plaintiff also required a sit/stand option, and unscheduled breaks six times a day for five minutes at a time; he was not required to elevate his legs or use an assistive device (Tr. 293-94) Dr. Pinson concluded that Plaintiff would likely be absent from work for more than four days per month (Tr. 294).

### b.  *Mental Limitations*

In February of 2010, Thomas Pearson, M.S., LLP ("LLP Pearson") – a limited licensed psychologist ("LLP") at Team Mental Health Services – began treating Plaintiff (Tr. 296).

On March 16, 2010, LLP Pearson completed a Psycho-Social Assessment (Tr. 275, 283) Plaintiff reported that he first began receiving mental health treatment in 2008 when he was hospitalized for severe depression and suicidal ideations; he was hospitalized a second time in

2009 due to depression and suicidal ideations (Tr. 275). Plaintiff attended outpatient treatment in

2009, but discontinued services due to heroin use (Tr. 275). He also received residential

substance abuse treatment multiple times; his last one was in November of 2009 (Tr. 275).

Plaintiff denied a history of suicidal gestures, homicidal ideations or gestures, and auditory or

visual hallucinations (Tr. 275). Plaintiff reported that he felt depressed, but denied any thoughts

of harming himself or others; his speech was goal-oriented; he denied any impairment in his

interpersonal or communication skills; and he reported that he could maintain all self-care and

daily living activities independently (Tr. 275). Plaintiff reported pain in his lower body, five

bulging discs, and one herniated disc; he was taking Vicodin and Valium for the pain (Tr. 276).

Plaintiff also reported that he was "easy to get along with" (Tr. 277). LLP Pearson diagnosed

Plaintiff with Major Depression Severe – Recurrent and assigned him a GAF score of 45 (Tr.

278).[8]

On March 17, 2010, Timothy Chapman, M.D. – a psychiatrist at Team Mental Health

Services – completed a psychiatric evaluation (Tr. 284-85). Dr. Chapman noted Plaintiff's

reported loss of interest, sadness, low energy, insomnia, irritability and forgetfulness (Tr. 284).

---

[8] The GAF score is:

> a subjective determination that represents the clinician's judgment of the individual's
> overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent
> danger of severely hurting self or others, persistent inability to maintain minimal personal
> hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50
> means that the patient has serious symptoms . . . OR any serious impairment in social,
> occupational, or school functioning (e.g., no friends, unable to keep a job).

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an
ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health
professional to turn medical signs and symptoms into a general assessment, understandable by a
lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.
App'x. 496, 502 n. 7 (6th Cir. 2006).

Dr. Chapman also noted Plaintiff's substance abuse history; Plaintiff reported that it had been less than one week since his last use (Tr. 284). Dr. Chapman further noted Plaintiff's strong goal orientation, and found that financial problems may have adversely affected his prognosis (Tr. 284). Dr. Chapman stated that the positive and negative findings of Plaintiff's mental health status were used to determine the appropriate treatment options, and noted that Plaintiff demonstrated good grooming, timeliness, orientation times four, euthymic mood, good eye contact, normal speech, logical and coherent thought process, no delusional thought, good insight, average intelligence and no obsessive or compulsive thought, with no suicidal ideations (Tr. 284). He diagnosed Plaintiff with Major Depressive Disorder, Single Episode, In Partial Remission and assessed a GAF score of 46 (Tr. 285).[9] Plaintiff was advised to return in one month; Dr. Chapman indicated that Plaintiff was taking a new antidepressant: Desyrel (Tr. 285).

On April 9, 2010, Plaintiff saw LLP Pearson; he discussed feeling depressed over the past few weeks, denied thoughts of harming himself or others, and reported stress because of a volatile home situation: "[w]e have a very dysfunctional family, that erupts into physical assaults, calling the police, always argueing [sic] and my mom threatening to kick me out of her house[.]" (Tr. 281).

Dr. Pinson's August 25, 2010 RFC questionnaires also indicated findings related to Plaintiff's mental limitations. On the bladder problem RFC, he listed anxiety, depression, and insomnia among Plaintiff's symptoms, and found that: depression, anxiety, psychological factors, and personality disorder affected Plaintiff's physical conditions; his symptoms were

_____

[9] It is not clear whether Dr. Chapman simply reviewed LLP Pearson's assessment, or arrived at these observations and conclusions after having met with Plaintiff personally. But, the illegible signature of a psychiatrist is found at the bottom of LLP Pearson's March 16 evaluation form (Tr. 279).

-14-

severe enough to constantly interfere with attention and concentration; stress exacerbated his urinary symptoms; and, he was incapable of performing even low-stress jobs (Tr. 286-88). Dr. Pinson also listed Plaintiff's antidepressant as part of his treatment; remarked that Plaintiff's medications caused drowsiness and affected his concentration; and, indicated that Plaintiff's impairments were likely to produce good days and bad days (Tr. 286-88). On his lumbar spine RFC, Dr. Pinson found that emotional factors contributed to the severity of Plaintiff's symptoms, which were severe enough to constantly interfere with his attention and concentration; his medications caused poor concentration and fatigue; and he had psychological stressors, poor concentration, and difficulty interacting with the public (Tr. 292-94).

On August 27, 2010, LLP Pearson completed a Psychiatric Evaluation Form and a Mental RFC Assessment (Tr. 295-305). LLP Pearson indicated that Plaintiff had decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide (Tr. 295-96). LLP Pearson noted that Plaintiff had Major Depression Severe single episode, and presented with flat affective symptoms; poor follow through with activities of daily living; decreased sleep; poor appetite; depressed mood and some mood swings; exacerbated symptoms "directly related to social environment and medical concerns"; deterioration from level of functioning; decompensation; an inability to cope with schedules and adapt to changing demands; and, poor decision-making (Tr. 296, 299-300, 304). Plaintiff reported that he had great difficulty in concentration and sustaining attention (Tr. 296). Plaintiff was taking an antidepressant (Tr. 301).

LLP Pearson found that Plaintiff was moderately limited in his ability to remember ideations and work-like procedures; understand and remember detailed instructions; maintain hygiene and grooming; maintain attention and concentration for extended periods; perform

activities within a schedule; maintain regular attendance and be punctual within customary

tolerances; work in coordination with or proximity to others without being distracted by them;

complete a normal workday and workweek without interruptions from psychologically based

symptoms; perform at a consistent pace without an unreasonable number of and length of rest

periods; respond appropriately to changes in the work setting; and, be aware of normal hazards

and take appropriate precautions (Tr. 298, 302-03).

Plaintiff was markedly limited in his ability to maintain social functioning, and

concentration, persistence, or pace (Tr. 295-96); carry out detailed instructions and sustain an

ordinary routine without special supervision; get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior, and

adhere to basic standards of neatness and cleanliness; and, set realistic goals or make plans

independently of others (Tr. 302-03).

LLP Pearson also found that Plaintiff had marked or extreme difficulties in concentration

and persistence in tasks, and: planning daily activities; getting along with family and friends;

cooperating with others; initiating social contact; responding to supervision and authority;

establishing interpersonal relationships; holding a job; avoiding evictions; interacting and

actively participating in group activities; completing tasks in a timely manner; assuming

increased mental demands associated with competitive work; and, sustaining tasks without an

unreasonable number of breaks and without undue interruptions or distractions (Tr. 298-99).

### D.  Plaintiff's Claims of Error

Plaintiff argues that the ALJ's findings are not supported by substantial evidence because

the ALJ: (1) failed to give proper weight to the medical opinions of LLP Pearson, Dr. Chapman,

and Dr. Pinson; (2) improperly relied on the Grids; (3) posed an erroneous hypothetical to the

vocational expert; (4) improperly relied on the state agency doctor and Dr. Ray; (5) erred in his credibility determination; (6) failed to find that his incontinence, depression, and upper extremity impairments were "severe" impairments; (7) failed to consider his combination of impairments; (8) utilized an RFC that did not include a function by function assessment; and, (9) deprived him of his substantial rights by failing to follow relevant statutes, case law, and regulations.

Because this Court finds reversible error in the ALJ's treatment of LLP Pearson's opinion, Plaintiff's additional arguments need not be addressed.

### 1.    Opinion Evidence

#### a.   Thomas Pearson, M.S., LLP

Plaintiff argues that the ALJ failed to give appropriate weight to the opinion of his treating psychologist – Thomas Pearson – as required by 20 C.F.R. § 404.1527(b)-(c).

The ALJ gave "little weight" to LLP Pearson:

> [LLP Pearson] opined that [Plaintiff] is markedly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods. The undersigned notes that [LLP] Pearson is not an acceptable medical source and that [LLP] Pearson did not base his opinion on any objective medical evidence. His opinion is inconsistent with the record as a whole.

(Tr. 37). Plaintiff argues that this is error, because Pearson – a Limited Licensed Psychologist – *is* an acceptable medical source per 20 C.F.R. § 404.1513.[10]

_____

[10] Plaintiff also suggests that the ALJ erred by not contacting either LLP Pearson or Dr. Chapman for clarification, pursuant to 20 C.F.R. § 404.1512(e) and SSR 96-5p. The duty to recontact is triggered when "the evidence does not support a treating source's opinion . . . *and* the adjudicator cannot ascertain the basis of the opinion from the record." SSR 96-5p (emphasis added). There is nothing in the ALJ's opinion to indicate that he could not understand the basis of LLP Pearson's opinion; but, because the ALJ found that the evidence did not support LLP Pearson's opinion and appeared to base his consideration of LLP Pearson's opinion largely on his belief that LLP Pearson was not an acceptable medical source, the ALJ ought to address

Although section 404.1513 includes "licensed or certified psychologists" among its list of acceptable medical sources, it does not explicitly classify LLPs. In Michigan, an LLP is an individual who: holds a master's degree in Psychology; has completed 2,000 hours of post-master's degree experience under the supervision of a fully licensed psychologist; and, must pass the Examination for Professional Practice in Psychology (EPPP).[11] But, an LLP has not achieved full licensure: that requires a doctorate, additional post-doctorate supervised experience, and a minimum EPPP passing score of 500.

Courts in this District have declined to categorize LLPs as acceptable medical sources. *See Madajski v. Comm'r of Soc. Sec.*, 12-10656, 2013 WL 1211904, at *1 fn 1 (E.D. Mich. Mar. 25, 2013); *Thatcher v. Comm'r of Soc. Sec.*, 12-CV-10288, 2013 WL 1316987, at *4 (E.D. Mich. Mar. 29, 2013); *Winhoven v. Comm'r of Soc. Sec.*, 12-12426, 2013 WL 4483463, at *14 (E.D. Mich. Aug. 19, 2013). And, although reasons exist to categorize an LLP as an acceptable medical source, beyond a conclusory assertion that the statute's use of "licensed psychologist" naturally includes *limited* licensed psychologists, Plaintiff substantiates no convincing argument to support departure from this trend.

Instead, LLP Pearson is at least an "other source" under the regulations. *See* 20 C.F.R. §§ 404.1513(d)(1), 404.1527(b); Social Security Ruling 06–03p, 2006 WL 2329939, at *4 (August

---

whether this case implicates the duty to recontact on remand. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir. 2010). The ALJ should also consider in what way Dr. Chapman's findings relate to LLP Pearson's, particularly considering that both mental health professionals were affiliated with Team Mental Health Services during the relevant time period and Dr. Chapman appeared to participate in LLP Pearson's treatment of Plaintiff.

[11] *See* Michigan Department of Licensing and Regulatory Affairs, Board of Psychology: Psychology Licensure Instructions, *available at* http://www.michigan.gov/documents/mdch_psyc_full_app_pkt_92012_7.pdf (last accessed September 25, 2013).

9, 2006). Other sources are entitled to special consideration due to their expertise and treatment

relationship with patients:[12]

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' . . . have increasingly assumed a greater percentage of the treatment and evaluation functions handled primarily by physicians and psychologists. Opinions from these medical sources who are not technically deemed 'acceptable medical sources,' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.

SSR 06-03p, 2006 WL 2329939 (S.S.A.), at *4; *see also Cole v. Astrue*, 661 F.3d 931, 939 fn. 4

(6th Cir. 2011) ("The practical realities of treatment for those seeking disability benefits

underscores the importance of addressing the opinion of a mental health counselor as a valid

'other source' providing ongoing care."); *Madajski*, 13 WL 1211904, at *1 fn 1.

    This Court must therefore evaluate whether the ALJ considered LLP Pearson's opinion

appropriately as an "other source." This is particularly important where: LLP Pearson was the

only mental health professional to render an opinion on Plaintiff's mental limitations;[13] and, the

ALJ afforded more weight to Dr. Abbasi – a non-examining state agency physician who

reviewed records prior to LLP Pearson's treatment with Plaintiff – and a onetime consultative

physician – Dr. Ray – neither of whom opined as to the functional effects of Plaintiff's mental

limitations.

---

[12] "In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to[:] . . . [m]edical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)[.]" 20 C.F.R. § 404.1513.

[13] Although Dr. Chapman made findings as to Plaintiff's mental health status, recorded Plaintiff's subjective symptoms, and diagnosed Plaintiff with Major Depressive Disorder, he rendered no *opinion* on his functional limitations (Tr. 284-85).

The regulations do not address how to assign weight to opinions from "other sources" such as LLPs who directly address the severity of a claimant's impairment or its effect on his ability to work. 20 C.F.R. § 404.1513(d). However, Social Security Ruling 06–03p, which the ALJ cited in his decision, does address the issue: when considering opinions of "other sources," an ALJ "should explain the weight given to [them] or otherwise ensure that the discussion of the evidence in the determination of a decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning when such opinions may have an effect on the outcome of the case."[14] SSR 06-3p. As such, "opinions from non-medical sources who have seen the claimant in their professional capacity should be evaluated by using the applicable factors [in 20 C.F.R. §§ 404.1527(d) and 416.927(d)], including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing *Martin v. Barnhart,* 470 F.Supp.2d 1324, 1328-29 (D.Utah 2006) (citing SSR 06–03p, 2006 WL 2329939, at **5-6)); *Lear v. Astrue,* CIV.A.4:08CV00077EHJ, 2009 WL 928371 (W.D. Ky. Apr. 3, 2009). An ALJ's explanation need not be extensive: a "succinct" analysis will suffice, so long as it "is sufficiently specific as to the weight given to [the other source]'s opinion and the reasons for assigning that weight." *Starr v. Comm'r of Soc. Sec.,* 2:12-CV-290, 2013 WL 653280, at *6 (S.D. Ohio Feb. 21, 2013).

The Commissioner argues that "the ALJ did not reject [LLP] Pearson's opinion solely because he found that [LLP] Pearson was not an acceptable medical source, but did so for two more significant reasons: that [LLP] Pearson did not base his opinion on any objective medical

---

[14] SSR 06-03p also makes clear that, in certain circumstances, an opinion from a healthcare provider who is not an "acceptable medical source" may be accorded greater weight than the opinion of an "acceptable medical source." SSR 06-03p, *5.

evidence, and that his opinion was inconsistent with the record as a whole" (Dkt. No. 21 at 13).[15]
The Commissioner's argument lacks merit.

First, the ALJ supported his determination by stating that LLP Pearson's opinion was inconsistent with the record *as a whole*. Elaboration on what inconsistencies the ALJ relied is lacking and thus evades adequate judicial review.

In support of its argument that the ALJ's findings are supported by substantial evidence, the Commissioner points to the ALJ's discussion of Plaintiff's "evidence of depression" at Step Two. But, even if this Court accepts these as the ALJ's bases for discounting LLP Pearson's opinion, it remains unclear whether the apparent inconsistencies constitute evidence sufficiently substantial to discredit LLP Pearson's opinion. For example, the Commissioner points to the ALJ's mention of LLP Pearson's March 16, 2010 assessment, which noted that Plaintiff was experiencing no suicidal ideations at the time of the assessment (Dkt. No. 12 at 12; Tr. 33). However, that same assessment indicates that Plaintiff had been hospitalized on multiple occasions during the relevant time period for suicidal ideations; and, in LLP Pearson's August 27, 2010 Psychiatric evaluation, he noted that Plaintiff was experiencing suicidal ideations (Tr. 295-96). Although this appears to be significant and relevant evidence, neither the Commissioner nor – more importantly – the ALJ mention it;[16] without elaboration, there is no way to know whether the ALJ disregarded this portion of LLP Pearson's treatment records, or instead found inconsistency significant enough to discredit LLP Pearson's opinion.

---

[15] All page numbers refer to CM/ECF pagination.

[16] The regulations emphasize the need for longitudinal evidence, acknowledging that a claimant's level of functioning may vary over time. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1(D)(2). Since the level of functioning at any specific time may seem relatively adequate or, relatively poor, proper evaluation of plaintiff's mental impairments must take into account variations in levels of functioning in determining the severity of impairments over time. *Id.*

Second, the ALJ's other reason for discrediting LLP Pearson's opinion – a conclusory statement that LLP Pearson did not base his opinion on *any* objective medical evidence – is beyond meaningful review. The Commissioner argues that the ALJ's finding here is supported by substantial evidence, because LLP Pearson's assessments are based primarily on Plaintiff's subjective statements. Assuming that this is true of the ALJ's reasoning, without further elaboration, it is not sound reason to reject psychological findings such as LLP Pearson's:

> The ALJ . . . rejects Dr. Patterson's assessment on the basis that it "rel[ies] substantially on the subjective presentation and statements of the claimant, who is not found to be entirely credible." . . . It is illogical, . . . since psychology and psychiatry are, by definition, dependent on subjective presentations by the patient. Taken to its logical extreme, the ALJ's rationale for rejecting Dr. Patterson's conclusions would justify the rejection of opinions by all mental health professionals, in every case.

*Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (In general, mental disorders cannot be ascertained and verified as are most physical illnesses . . . .[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field . . . [,and their] report[s] . . . should not be rejected simply because of the relative imprecision of the [] methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques (citing *Poulin v. Bowen,* 817 F.2d 865, 873–74 (D.C.Cir.1987)) (quoting *Lebus v. Harris,* 526 F.Supp. 56, 60 (N.D.Cal.1981))); *see generally Angster v. Astrue*, 703 F. Supp. 2d 1219 (D. Colo. 2010) (substantial evidence did not support ALJ's decision to reject the opinion of examining psychologist, even though opinion was based in part on claimant's subjective statements; practice of psychology was dependent in part on a patient's subjective statements).

-22-

A close review of the ALJ's decision reveals an additional reason for which the ALJ may have decided to discredit LLP Pearson's opinion. In discounting Plaintiff's credibility, the ALJ makes the following limited mention of Plaintiff's mental limitations:

> [Plaintiff] testified that he has had a history of depression and that he has had depression for most of his life, which has only gotten worse. Yet, he also testified that he only started seeing a therapist in February 2010 and that prior to this he had not seen a therapist since 2001.

(Tr. 37-38). To the extent that this is among the ALJ's reasons for discrediting LLP Pearson's opinion, it is likewise insufficient.[17] *See Blankenship*, 874 F.2d at 1121-24 (6th Cir. 1989) (noting that a claimant's failure to seek treatment for a mental impairment may be a result of the impairment itself rather than evidence that the impairment is not severe).

It is also unclear whether the ALJ considered the additional recommended factors: that Plaintiff had treated with LLP Pearson approximately once a month between February and August of 2010 (Tr. 275-79, 296); the supportability and consistency of LLP Pearson's opinion (e.g., how *all* other medical evidence on the record relates to LLP Pearson's opinion,[18] that Dr.

---

[17] As it is equally insufficient a consideration in determining Plaintiff's credibility; the ALJ should therefore also revisit the question of Plaintiff's credibility on remand.

[18] The only other mental health professional on record, Dr. Chapman, gave no opinion at all, let alone findings that ostensibly contradicted LLP Pearson's findings; and, there are no readily discernible inconsistencies in any of the other physicians' notes (i.e., that Plaintiff was *not* affected by depression or experiencing exacerbated physical impairments because of emotional and psychological impairments). It is conceivable that the ALJ based his finding of inconsistency on a *lack* of notations regarding psychological symptoms and their effect on Plaintiff's occupational abilities. For example, an examination of the record reveals no mention of Plaintiff's depression or any other psychological symptoms in consultative physician Dr. Ray's December 2009 evaluation; the closest the evaluation gets to such commentary is that Plaintiff was independent in his activities of daily living (Tr. 240-41). However, without the ALJ's express elaboration of such reasoning, the best that this Court can do is surmise.

Pinson's treatment notes indicate that Plaintiff was taking antidepressants,[19] how Dr. Chapman's treatment related to LLP Pearson's opinion, etc.); or, that LLP Pearson is the *only* mental health professional to have opined on Plaintiff's mental limitations. *See* SSR 06-3p, **4-5; 20 C.F.R. § 404.1527(d). "In sum, since the ALJ summarily discounted the opinions of [LLP Pearson], rather than applying the factors in 20 C.F.R. § 404.1527(d), the administrative decision does not comport with applicable law." *Lear v. Astrue*, CIV.A.4:08CV00077EHJ, 2009 WL 928371 (W.D. Ky. Apr. 3, 2009).

The need for clarification of the reasons behind an ALJ's weight of an "other source" may be less pressing where multiple professionals give conflicting opinions on the severity and functional limitations of a plaintiff's mental limitations. But, that is not the case here. And, although ALJs are vested with the "discretion to determine the proper weight to accord opinions from 'other sources'" such as LLP Pearson, the ALJ's decision here lacks a clear explanation of the weight he accorded to LLP Pearson and obscures his reasoning – this Court is not convinced that substantial evidence supports the ALJ's weight of LLP Pearson's opinion. *See* SSR 06-03p.

---

[19] Although the ALJ gave little weight to the opinion of longtime treating physician Dr. Pinson, the ALJ's discussion of Dr. Pinson's treatment – beyond doing little more than effectively listing each of Dr. Pinson's findings – included no *discussion* of Dr. Pinson's opinion, particularly as it related to Plaintiff's *mental* impairments (e.g., that Plaintiff's symptoms were severe enough to constantly interfere with attention and concentration (Tr. 286-88)) (Tr. 36). For example, the ALJ makes no mention that Dr. Pinson regularly prescribed antidepressants, and fails to explain how LLP Pearson's opinion squares with Dr. Pinson's opinion as it relates to Plaintiff's mental impairments (e.g., that Plaintiff's mental impairments affected his occupational limitations, that Plaintiff could not tolerate stress, etc.). This is a question worth answering, particularly because of Dr. Pinson's over six-year treating relationship with Plaintiff, a factor that the ALJ fails to mention anywhere in his opinion. *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). On remand, the ALJ should reevaluate how Dr. Pinson's findings are incorporated into his evaluation of LLP Pearson's opinion.

On remand, the ALJ may determine that LLP Pearson should be afforded more, less, or the same weight as he previously determined in the decision that is presently before the Court. The ALJ should reformulate his RFC based on his new conclusions regarding the proper weight to be accorded LLP Pearson's opinion.

### 2.    Plaintiff's Additional Arguments

Because a proper analysis of the opinion of Plaintiff's psychologist could lead to a decision that Plaintiff is disabled, this Court need not address his additional arguments. On remand, the ALJ must properly evaluate the opinion of LLP Pearson and incorporate this proper evaluation into a thorough analysis of Plaintiff's disability claim.

### IV.    CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is **GRANTED**, the Commissioner's motion for summary judgment is **DENIED**, and the case is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS ORDERED**.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  September 26, 2013

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, September 26, 2013, by electronic and/or ordinary mail.*

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*